**BETTER GOVERNMENT BUREAU, INC., an Ohio Corporation, Plaintiff,**

v.

**Darrell V. McGRAW, Jr., et al., Defendants.**

**Civil Action No. 2:94–0952.**

United States District Court, S.D. West Virginia, Charleston Division.

April 25, 1996.

---

While the appeal was pending, Plaintiff Better Government Bureau, Incorporated ("BGB") sought a remand from the Court of Appeals based on two newly discovered memoranda, one of which was given to BGB by Ms. Donna Willis, a former employee of the Attorney General's Office.[2] On February 1, 1996 the Fourth Circuit remanded this case to permit consideration of relief under *Rule 60(b), Federal Rules of Civil Procedure* and to allow supplemental discovery concerning the memoranda.

This Court then (1) permitted BGB an abbreviated discovery period to develop issues surrounding the two documents and alleged attempts to destroy or conceal them; and (2) temporarily vacated the October 16 Memorandum Opinion. The vacation of the prior Memorandum Opinion was "for the limited purpose of allowing further supplementation of the qualified immunity analysis, if necessary, pending further discovery." Vacation Order at ¶ 4.

E. Joseph Buffa; Kopelman & Associates, Charleston, WV, Roger P. Furey, Michael B. Adlin; Arter & Hadden, Washington, DC, for plaintiff.

David P. Cleek, Cleek, Pullin, Knopf & Fowler, Charleston, WV, for defendants.

Michael C. Allen, Barbara H. Allen; Allen & Allen, Charleston, WV, for Barbara H. Allen.

## SUPPLEMENTAL MEMORANDUM OPINION AND ORDER

HADEN, Chief Judge.

On October 16, 1995 the Court denied Defendant Darrell V. McGraw's motion for summary judgment on the issue of qualified immunity. *Better Gov't Bureau, Inc. v. McGraw*, 904 F.Supp. 540, 553 (S.D.W.Va. 1995).[1] McGraw immediately noticed an interlocutory appeal from that ruling.

## I. DISCUSSION

BGB seeks a substantial factual supplementation of the prior Memorandum Opinion to reflect additional evidence of: (1) Defendants' retaliatory intent; and (2) Defendants' knowledge that they were violating clearly established law. BGB is correct that the evidence uncovered during the supplemental discovery period "provides strong additional support for the Court's qualified immunity analysis." Pl.'s Mem. in Supp. of Supplementation of the Court's Qualified Immunity Analysis at 1 (hereinafter "Pl.'s Mem. in Supp.")

Nevertheless, far-reaching supplementation is unnecessary. Both BGB's and Defendants' assertions regarding the matters uncovered on remand are now part of the record and are available in both the parties' briefs and their designations for the Joint Appendix on appeal. The information is as

1. BGB alleges viable personal capacity claims against only Defendant McGraw. *McGraw*, 904 F.Supp. at 547. The claims against Defendant Hechler and Defendant Better Government Bureau are official capacity claims. *Id.* at 547–48. Accordingly, McGraw is the only Defendant putatively entitled to interpose a qualified immunity defense. *Id.* at 549 n. 10 ("Defendants rightly concede the qualified immunity defense 'does not apply to official capacity suits.'") (quoted authority omitted).

2. Since the disclosure, Ms. Willis was terminated by the Attorney General's Office.

available to the Court of Appeals as it has been to this Court.

A thorough treatment of the events that led to this lawsuit are contained in the *McGraw* opinion of October 16, 1995. That in-depth factual development will not be duplicated here, but is incorporated by reference.

As noted previously in *McGraw*, in determining whether the challenged actions violated clearly established law, "the Court focuses on the law as it existed at the time of the alleged violation and 'examines the facts alleged by the plaintiff, not those asserted by the defendant.'" *McGraw*, 904 F.Supp. at 549 (citing *Buonocore v. Harris*, 65 F.3d 347, 353 (4th Cir.1995); *Torcasio v. Murray*, 57 F.3d 1340, 1352 (4th Cir.1995), *cert. denied*, —— U.S. ——, 116 S.Ct. 772, 133 L.Ed.2d 724 (1996); and *DiMeglio v. Haines*, 45 F.3d 790, 794 (4th Cir.1995)) (citations omitted).

The two memoranda at issue on remand were dated just days prior to McGraw's incorporation of his Better Government Bureau entity. The first memorandum was sent on September 26, 1994 from Assistant Attorney General Daynus Jividen to Defendant Ken Hechler. Jividen testified McGraw personally directed him to send the memorandum, which provides as follows:

> The Attorney General's Office anticipates that an organization called the Better Government Bureau, out of Canton, Ohio, will shortly seek registration, through your office, in order to conduct its alleged business in the State of West Virginia. When the Better Government Bureau attempts registration the Attorney General requests your office to resist and refuse such registration on the grounds that the Better Government Bureau's attempt to ply its business in our state constitutes a fraud and a deceit.
>
> Also, please inform me when the organization's application is received by your office.

Ex. A to Pl.'s Mem. in Supp.[3]

Defendant Hechler testified he was "a little bit surprised" by the "resist and refuse"

---

**3.** Defendant McGraw points to *State ex rel. McGraw v. Imperial Marketing*, No. 22809, —— W.Va. ——, —— S.E.2d —— [1996 WL 128168] (W.Va. Mar. 20, 1996); a decision issued nearly two years after the conduct alleged in this case, to support his proposition that he viewed BGB as a fraud and a "deceit." In *Imperial*, the Supreme Court of Appeals upheld the issuance of a preliminary injunction against Suarez Corporation Industries (SCI) arising out of the lower court's finding that there was "reasonable cause" to believe that SCI was engaging in or likely to engage in conduct in violation of the West Virginia Prizes and Gifts Act, *West Virginia Code* § 46A–6D–1 to –10. *Id.* at 1. The West Virginia Court left no doubt where it stood on SCI's nefarious practices: "SCI's sweepstakes are nothing more than ingeniously crafted deceptive methods to sell its merchandise by deluding consumers with expectations of greater rewards if they purchase the product that is the subject of the solicitation." *Id.* at 20–21. Further, the West Virginia Court was not particularly complimentary of a principal of SCI, Benjamin Suarez. *Id.* at 26. As noted in the prior Memorandum Opinion, this Court is well aware of Mr. Suarez's significant links to BGB. *McGraw*, 904 F.Supp. at 544 n. 1.

There are at least two troubling considerations relating to Defendant McGraw's fraud and deceit argument. While there is evidence McGraw was pursuing and investigating SCI, there is a decided lack of any indication that McGraw investigated equally BGB's activities and underpinnings. While McGraw alluded to some sort of pre-memorandum investigation into BGB's background, he is woefully short on specifics. Further, while Hechler's memorandum requested that Jividen "spell out in writing the fraud and deceit to which [Jividen] refer[red] in [the] September 26 memorandum[,]" the follow-up information was never received from either Jividen or Defendant McGraw.

The United States Supreme Court, in a case dealing with the First Amendment rights of public employees, suggested recently that before a government employer can discharge an employee for unprotected speech, it must first perform a reasonable investigation to determine what the speech was and believe in good faith the facts on which it purports to act. *Waters v. Churchill*, —— U.S. ——, —————, 114 S.Ct. 1878, 1889–90, 128 L.Ed.2d 686 (1994) (plurality opinion). Although *Waters* was a plurality decision, Justice Souter observed in concurrence that the Majority accepted the "reasonable investigation" requirement. *Id.* at ——, 114 S.Ct. at 1893. The same requirement is even more compelling in this analogous case because the government, when acting as an employer, is given "a freer hand in regulating the speech of its employees than it has in regulating the speech of the public at large." *Id.* at ——, 114 S.Ct. at 1886. The record here leads one to infer the necessary reasonable investigation and good faith are not demonstrable.

Second, assuming Defendant McGraw can prove his fraud and deceit allegations at trial,

request. Hechler dep. at 16. His response, dated September 27, 1994, set forth in pertinent part below, reveals his concerns:

> In response to your memorandum of September 26, *and after personal discussion with the Attorney General,* I will be pleased to inform you when the Better Government Bureau actually attempts to register with the Secretary of State's office. The issue of resisting and refusing such registration is more complicated that [sic] I at first imagined.
>
> I do not recall any instance when any organization has been denied registration *because of its political activity.* You [sic] memorandum refers to the BGB's 'attempt to ply its business in our state constitutes a fraud and a deceit.' Without passing judgment as to whether this would constitute sufficient grounds for resisting and refusing registration, I would ask that you spell out in writing the fraud and deceit to

which you refer in your September 26 memorandum.

> I look forward to working with you on this issue, *with the understanding that when an organization is in good standing in our neighboring state of Ohio, that makes it very difficult to deny registration in West Virginia.* However, I will be pleased after receiving your response to. this memorandum to consider this issue further *within the confines of the law* which governs our corporate chartering.

*Id.* at Ex. B. (emphasis added).

First, the thrust of BGB's allegations are that McGraw attempted to block BGB's efforts to do business in West Virginia in retaliation for the latter's negative comments about McGraw and his staff in the Charleston media.[4] The probative value of these memoranda in proving BGB's allegations is obvious. It is worth noting that the Jividen memo made no direct or even indirect refer-

---

that alone may not carry the day. Where SCI's speech is clearly characterized as commercial in nature, the same cannot as easily be said in reference to the purely political speech engaged in by BGB. The alleged conduct here is more analogous to the situation addressed last term in *McIntyre v. Ohio Elections Comm'n,* —— U.S. ——, 115 S.Ct. 1511 (1995). In *McIntyre,* the Ohio Supreme Court upheld the constitutionality of an Ohio statutory prohibition against distribution of anonymous campaign literature. The court justified its conclusion, in part, on the ground that the "law serve[d] to identify those who engage in fraud, libel or false advertising." *McIntyre v. Ohio Elections Comm'n,* 67 Ohio St.3d 391, 618 N.E.2d 152, 155–56 (1993). The Supreme Court reversed and stated as follows:

> But political speech by its nature will sometimes have unpalatable consequences, and, in general, our society accords greater weight to the value of free speech than to the dangers of its misuse. Ohio has not shown that its interest in preventing the misuse of anonymous election-related speech justifies a prohibition of all uses of that speech. *The State may, and does, punish fraud directly. But it cannot seek to punish fraud indirectly by indiscriminately outlawing a category of speech, based on its content, with no necessary relationship to the danger sought to be prevented.*

*McIntyre,* —— U.S. at ——, 115 S.Ct. at 1524 (emphasis added) (citations omitted). Taking BGB's allegations as true, Defendant McGraw did not initially undertake the *direct* route of thoroughly investigating BGB and seeking injunctive relief under the West Virginia Consumer Credit and Protection Act or other appropriate consumer protection legislation when or if he

discovered potential fraud. Rather, he attempted to punish BGB *indirectly* by cutting off BGB's critical speech at its root and preempting BGB's use of its name in this State. What Defendant McGraw allegedly did, to borrow from a colloquial description of the overbreadth doctrine, was to impermissibly " 'burn the house to roast the pig[.]' " *West Virginia Pride, Inc. v. Wood County,* 811 F.Supp. 1142, 1147–48 n. 5 (S.D.W.Va.1993) (quoting *Butler v. Michigan,* 352 U.S. 380, 383, 77 S.Ct. 524, 525–26, 1 L.Ed.2d 412 (1957)).

4. Defendant McGraw himself, as the Court noted previously, did not simply let BGB's criticism roll off his back. Rather, he took it as a personal attack:

> Defendant McGraw conceded the 'attack[s]' [by BGB] he was speaking of [in a letter to his fellow attorneys general] were, at least in part, [BGB's] 'negative' comments directed at McGraw and his office through the media. *See, e.g.,* McGraw dep. at 43 (stating in regard to [BGB's] radio announcement "[t]his is a political thing, all right, and it's intended to evoke a negative reaction. And so copy that is used in the political arena to evoke a negative reaction against a public figure is in the business considered to be an attack.").

*McGraw,* 904 F.Supp. at 551. He also suggested in his deposition during the supplemental discovery period that BGB's statements directed at him and members of his office constituted an "obstruction of justice" merely because the statements were "intended to modify the behavior of public officials." McGraw dep. at 58.

ence to BGB's political activity as a basis for denying registration. Further, Jividen testified his only communication with Defendant Hechler regarding BGB in September 1994 was the memorandum he sent on September 26. That leads one to reasonably conclude it was McGraw who raised the "political activity" specter with Defendant Hechler during the "personal discussion" between the two. This is buttressed by Defendant Hechler's statement in the memorandum that "[t]he issue of resisting and refusing [BGB's] registration is more complicated that [sic] I *at first imagined* [,]" thus indicating he had prior discussions with someone on the matter. Ex. B to Pl.'s Mem. in Supp. (emphasis added). Defendants deny this occurred.[5]

In sum, taking BGB's allegations as true for determining whether a violation of clearly established law occurred, the memoranda give rise to a strong inference that (1) McGraw discussed halting BGB's attempts to register to do business in West Virginia with Defendant Hechler; and (2) McGraw's actions were aimed at burdening the political speech BGB aimed at McGraw and his staff. There is a substantial indication someone implicitly or explicitly broached the subject of BGB's political activity as a basis for denying registration, and that motive was not lost on Defendant Hechler according to his response memorandum.

Second, the alleged innocent non-production of the Jividen memorandum during discovery is very difficult for the Court to credit when one considers the timing of these events. Again, one must remember the memorandum was drafted on September 26, 1994 allegedly just moments after Jividen met with McGraw and another member of the Attorney General's office, and a copy was sent to McGraw. BGB's lawsuit, with the core allegations that Defendants attempted to block BGB's efforts to do business in West Virginia in retaliation for the latter's negative comments about McGraw and his staff, was filed just **one month later.** Nevertheless, the Jividen memorandum was not produced in the months of discovery that followed

5. "Deny" is perhaps too strong a word. Defendant McGraw corrected BGB's counsel and suggested that while he (McGraw) would not rule out the possibility that he had a discussion with Defendant Hechler about BGB's political activity, he "didn't remember" such a conversation. McGraw dep. at 54. Defendant Hechler at first categorically suggested his "personal discussion" with McGraw simply related to (1) Hechler's willingness to tell McGraw when BGB attempted to register to do business in West Virginia and not (2) BGB's political activity or the request to deny or resist registration. This categorical assertion was later qualified by Hechler:

> Well, obviously documents as you know help a person to get clearer recollection of what occurred. And independent recollection is hard to separate from what you have down in black and white because this was a very, very small blip on my radar, on my radar screen actually since my office handles not only a huge number of transactions but is involved in elections and charities and a multiplicity of other activities.
> I know this is important to you and your client, but, yet, to me it was a very small matter. So when you ask the question of whether or not I have independent recollection of a conversation, I'm trying to recollect as clearly as I can things that happened a year and a half ago. And that's my clear recollection which is enforced, reinforced by what the document says.

Hechler dep. at 9. Further, with admirable and refreshing candor atypical to this case, Defen-

dant Hechler later admits both he and Defendant McGraw's discussions did indeed go a bit further:

> Q  Did you ever have any discussions with Mr. McGraw regarding why he wanted to take any efforts to resist the Better Government Bureau's efforts to register with your office?
> A  The only discussion that we had concerned the type of activity which the Better Government Bureau was directing at Tom Rodd [an official in Defendant McGraw's office] to try to smear him as a felon. And as I think I previously indicated, I had some sympathy with that since I personally had been opposed to the war in Vietnam myself. And that was the—That was the major discussion and the discussion which we had other than the issue of, 'If the Better Government Bureau attempts to register, would you let me know.'
> . . .
>  . . . .
> Q  In your discussion with Mr. McGraw in which you talked about the Thomas Rodd situation, did Mr. McGraw indicate that because of the way the plaintiff had referred to Mr. Rodd in the press that he wanted to block the registration of that company in West Virginia?
> A  No, that issue never arose during our conversation. He was simply indicating his strong protective feelings protecting Mr. Rodd against the kind of things that were being said about him in the rally that was apparently held in Washington, D.C.

*Id.* at 11–13.

shortly after the memorandum was prepared. BGB observed "[i]t is simply incredible that all of these witnesses overlooked or forgot a memo in which McGraw attempted to block BGB's efforts to register to do business four weeks before BGB sued McGraw for allegedly interfering with BGB's efforts to do business." Pl.'s Mem. in Supp. at 5–6. As conceded by Jividen to Hechler after BGB's untimely discovery of the memorandum, explaining the timing of these events and the nondisclosure have turned out to indeed be a "'rocky road'" for Defendants. Hechler dep. at 50.

## II. CONCLUSION

In their reply brief in support of summary judgment filed nearly one year ago, Defendants asserted as to McGraw's motives for choosing the name for his entity and incorporating it:

> The evidence demonstrates that Judge McGraw had long contemplated creating a government agency to be an advocate for consumer programs and to provide tools for consumer education. (McGraw, D. 78) He chose 'Better Government Bureau' *because he liked its 'ring' and felt it was an appropriate name for an agency such as he had contemplated. Id.* Thus, defendants have established a legitimate, non-retaliatory motive for its [sic] conduct.

Defs.' Reply to Pl.'s Oppos. to Defs.' Mot. for Summ.Jgt. at 2 (emphasis added).

While the jury ultimately will have to determine McGraw's motives for incorporating the challenged entity, his putatively innocent motive does not "ring" true in light of either the subject of this ruling or that contained in the prior Memorandum Opinion.

Accordingly, the Court **REINSTATES** its October 16 Memorandum Opinion and Order and reaffirms its conclusion Defendant McGraw is not entitled to qualified immunity.

